UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TIFFERY WILLIAMS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:17-CV-1901 |
| | § | |
| GUARDIAN LIVING SERVICES, INC., | § | |
| *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiff's First Amended Motion for Conditional Certification and Notice (Doc. No. 28).

## I. INTRODUCTION

This is a Fair Labor Standards Act ("FLSA") case. Plaintiff Tiffery Williams ("Ms. Williams" or "Plaintiff") seeks conditional certification of a collective action consisting of:

> **All Direct Care Staff employees employed by Guardian Living Services, Inc., in the past three (3) years who were not paid the full time-and-a-half overtime premium for overtime hours worked in a given workweek.**

Defendant Guardian Living Services, Inc. ("Guardian" or "Defendant") opposes the motion.

## II. FACTUAL BACKGROUND

The following facts are not in dispute. Guardian operates a business that provides homecare to adults with intellectual disabilities. For nine months, Ms. Williams worked for Guardian as a Direct Care Staff ("DCS") employee. In that role, Ms. Williams's Plaintiff's job duties included mopping the floor, cleaning patient rooms, preparing lunch for the patients,

assisting patients with daily activities, transporting patients to their doctor appointments, inspecting the patients for injuries or abuse and filling out paperwork.

According to Plaintiff's most recent Motion, Ms. Williams worked alongside approximately 15-25 other DCS employees. (Doc. No. 28 at 3.)

## III. PROCEDURAL BACKGROUND

When the case was first filed, Plaintiff relied on two pay stubs and a timesheet as *prima facie* evidence that she and her co-workers were subject to a policy of no overtime payment. This Court rejected that claim at a hearing on December 1, 2017 because Plaintiff simply misread her compensation documents.

At that hearing, Plaintiff introduced two new arguments. First, Plaintiff averred that Defendant is liable for a recordkeeping violation because Guardian required Ms. Williams to prefill her timesheets and to record only her assigned shifts rather than actual hours worked. Second, Plaintiff suggested that Defendant is liable for off-the-clock work compensation because Plaintiff and her colleagues would arrive at work before their shifts to check patients for signs of abuse and neglect and Defendant prevented employees from recording that time. The Court afforded Plaintiff time to plead these new allegations and then entered her Amended Complaint (Doc. No. 24).

Plaintiff filed this First Amended Motion for Conditional Certification and Notice pursuant to that Amended Complaint.

## IV. STANDARD OF REVIEW

On motions for collective action certification in FLSA cases, the Fifth Circuit has affirmed district courts' use of the lenient standard adopted by the United States District Court

for the District of New Jersey in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). *See*, *e.g.*, *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–16 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). The *Lusardi* approach consists of two steps: (1) the plaintiff's motion for conditional certification, and (2) the defendant's motion for decertification.

At the first stage, the court must decide whether notice of the action should be given to potential class members. *Id*. at 1213–14. The court's decision at that stage is usually based on the pleadings and affidavits that have been submitted and is made using a "fairly lenient standard, [which] typically results in 'conditional certification' of a representative class." *Id*. at 1214; *see also Tolentino v. C & J Spec–Rent Servs. Inc.*, 716 F. Supp. 2d 642, 647 (S.D. Tex. 2010) ("The remedial nature of the FLSA and § 216 militate strongly in favor of allowing cases to proceed collectively."). Plaintiffs may proceed collectively only if the challenged conduct is a generally applicable rule, policy, or practice. *McKnight v. D.Houston, Inc.*, 756 F. Supp. 2d 794, 801 (S.D. Tex. 2010) (quoting *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005)). Therefore, conditional certification should be denied when the action arises from circumstances purely personal to the plaintiff. *Id*.

In order to obtain conditional certification, the plaintiff must make a "minimal showing" that: (1) there is a reasonable basis for crediting the assertions that aggrieved individuals exist and (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted. *McKnight*, 756 F. Supp. 2d at 801. Courts in this Circuit are divided as to whether plaintiffs are required to present evidence supporting a third element: that other individuals want to opt in to the lawsuit. *Compare Heeg v. Adams Harris, Inc*, 907 F.Supp.2d at 861 (applying third element) *and* Tolentino, 716 F. Supp. 2d at 647 (same) *with*

*Jones v. Cretic Energy Servs., LLC*, 149 F. Supp. 3d 761, 768 (S.D. Tex. 2015) (declining to apply the third element) *and Dreyer v. Baker Hughes Oilfield Operations, Inc*., Civil Action No. H–08–1212, 2008 WL 5204149, at *3 (S.D. Tex. Dec. 11, 2008) (same).

On at least one occasion, this Court has applied the third element. Upon reflection, the Court now decides that the two-element test is more appropriate.

The strongest argument in support of the third element is that it helps the court balance concerns regarding judicial economy with the desire to avoid the "stirring up" of litigation through unwarranted solicitation. *Bunker v. PCP For Life, PA*, 2017 WL 3187610, at *2 (S.D. Tex. July 26, 2017) (internal citation omitted). That justification is overpowered, however, by four reasons to reject the third element:

> First . . . this element is not a statutory requirement at this stage. Second, this element has not been required, or even discussed, by any higher court opinion that this court has been able to find or to which the parties have cited. Rather, the Fifth Circuit's discussion of the *Lusardi* approach only requires, at the first stage, that putative class members' claims are sufficiently similar to merit sending notice of the action to possible members of the class. Third, unlike under Rule 23, there is no numerosity requirement in a FLSA class action lawsuit under the *Lusardi* approach. Fourth, this element, requiring evidence of purported class members who are willing to join a class action before an appropriate class is even determined, is dissonant with the Supreme Court's directive that the FLSA be liberally construed to effect its purposes.

*Villarreal v. St. Luke's Episcopal Hosp*., 751 F. Supp. 2d 902, 916 (S.D. Tex. 2010) (internal citations omitted).

The other two requirements at this stage – (1) that there is a reasonable basis for crediting the assertions that aggrieved individuals exist, and (2) that those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted – sufficiently safeguard against the risk of "stirring up" unwarranted litigation. In the hypothetical case where the post-certification opt-in process reveals that there are no additional plaintiffs who

desire to join the lawsuit, it is true that the defendant would have incurred some disclosure costs and possibly a reduction in settlement value, but the plaintiff would have also incurred the significant costs of communicating notices and reminders. Those plaintiff costs should sufficiently deter unwarranted solicitation. Additionally, certain potential plaintiffs might hesitate to express willingness to join a collective action before it is certified by the court, due to fear of retaliation, even if they would ultimately join and benefit from it. The two-element test furthers the remedial purposes of the FLSA by protecting them.

Accordingly, this Court now elects the two-element approach; at the *Lusardi* certification stage, a plaintiff need not present evidence that other individuals want to join the lawsuit.

## V. ANALYSIS

### a. Recordkeeping violation

Plaintiff argues that Guardian required Ms. Williams to prefill her timesheets and record only her assigned shifts and not her actual work hours or any overtime hours. There is no evidence, however, of any such generally applicable rule, policy, or practice. In fact, Plaintiff's own timesheets and pay stubs reflect compensated .5-hour overtime work on multiple occasions. (Doc. No. 30, Exhibit #4.) Accordingly, this claim is unfit for conditional certification because there is no reasonable basis for crediting Ms. Williams's assertions that similarly aggrieved individuals exist.

### b. Off-the-clock work

Plaintiff's Motion states that Guardian requires DCS employees to conduct "body checks" off-the-clock before the beginning of their shifts. (Doc. No. 28.) Plaintiff's declaration describes the body check as follows:

5

> To do a thorough body check, Guardian required me, as the DCS whose shift is ending to do the following:
> a. Remove all the Patients' clothes including their diaper even if the Patient resisted this;
> b. Inspect the body of the patient for bruises, bite marks, scratches, burns or diaper rash or bedsores.
> c. Put a new diaper on the Patient and redress the Patient completely.
>
> The incoming DCS observes me performing this inspection. When I am the relieving DCS, I observe while the person I relieve conducts the inspection.

(Doc. No. 28, Exhibit #1, ¶¶ 7-9.)

Plaintiff argues that these "body checks" are crucial because a DCS employee is liable for any injury that is identified during that employee's shift, even if such injury occurred during the prior shift (such that it would be incumbent upon DCS employees to check patients before their shift begins).[1] Defendant counters that there is no requirement to perform a "body check" as Plaintiff describes it and that in fact, what Plaintiff describes is a HIPAA violation. (Doc. No. 30, Exhibit #3.)

There is no documentary evidence in the record to verify the "body check" procedure as Ms. Williams recounts it. There is ample evidence in employee declarations suggesting that no such "body check" requirement existed. *See* Doc. No. 31, Exhibit #1, ¶ 6; Doc. No 30, Exhibit #2, Doc. No 30, ¶ 8; Exhibit #2, ¶ 7.[2] However, there is also evidence that some kind of patient observation was required[3], albeit in a less intrusive form.[4]

---

[1] Christina Kizzee, the owner of Guardian, acknowledged the following during her deposition: "If an employee assumes their shift . . . and a patient has [a physical injury] . . . that resulted from a prior shift but was not identified until the employee's shift or middle of their shift or end of their shift, that employee would be responsible for that injury . . . ." (Doc. No. 28, Exhibit #2 at 20.)

[2] Plaintiff rightly points out that it would be inappropriate to afford significant weight to "happy camper" declarations of employees when those individuals have not been deposed. *See In re Wells Fargo Wage & Hour Employment Practices Litig*. (No. III), No. H-11-2266, 2012 WL 3308880, at *18 (S.D. Tex. Aug. 10, 2012). But the Court need not ignore them entirely.

[3] One of Ms. Williams's coworkers, Aqua McGee, declared:

There is also evidence that pre-shift or post-shift work was required in the form of verbal shift summaries from the outgoing to the incoming employee.

One of Plaintiff's coworkers (a declarant for Defendant) stated, "Guardian instructed us to do verbal shift summaries . . . For example, when Tiffery arrived for her shift, I would provide her with a summary about my shift – such as the client's sleeping schedule or bowel movements; whether the client had problems taking medication, how much the client ate, any issues the client was having, anything unusual that happened during my shift, etc." (Doc. No. 30, Exhibit #2, ¶ 8.) Another of Defendants' declarants stated, "Guardian instructed us to do verbal shift summaries . . . For example, when I arrived for my shift, Tiffery would provide me with a summary about her shift." (Doc. No. 30, Exhibit #3, ¶ 6.) A declarant for the Plaintiff stated, "Guardian . . . required the DCS to give each other [a] shift change report about what happened during the shift. One or both of the DCS would do the shift change report off the clock." (Doc. No. 31, Exhibit #1, ¶ 11.)

Defendant is correct that Plaintiff and her sole supporting declarant cannot point to any written company policy requiring employees to perform shift change procedures off-the-clock.

---

> Before I or another DCS start our shift, we were to come in before our shift and conduct an inspection of the patients for bodily injury. If the patient has any injury, the DCS are supposed to report to Guardian and the state as soon as we find any bruising or injury.
>
> The DCS who was on duty when the bruising or injury occurred was responsible. That is why I and other DCS come in before our assigned shift begins to do the inspection because if we discover the injury to the patients once our shift time starts we would be held responsible.
>
> . . .
>
> Since the inspection is performed by the incoming DCS and the DCS who is being relieved, one or both of us would be performing the shift change procedure off the clock.

(Doc. No. 31, Exhibit #1, ¶¶ 9-11.)

[4] *See* Doc. No. 30, Exhibit #2, ¶ 8 ("Clients are not completely undressed to perform any type of 'body check.' We visually examine the client while they are fully clothed.") *See also* Doc. No. 25, ¶ 18 (Defendant's admission that "Defendant has written policies on how to identify different levels of abuse and neglect of their patients (See Exhibit 2) and a reporting policy for suspected cases of abuse, neglect or exploitation (See Exhibit 3).").

7

Defendant is also correct that the three coworkers quoted above cannot agree on the precise content of the off-the-clock work (most notably with respect to patient injury inspection procedure). Nonetheless, at this stage, Plaintiff must make only a "minimal showing" that (1) there is a reasonable basis for crediting the assertions that aggrieved individuals exist and (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted. *McKnight v. D. Houston, Inc.*, 756 F. Supp. 2d 794, 801 (S.D. Tex. 2010).

Although at the outer edge of acceptability under this lenient standard, Plaintiff's claim passes muster. There has been a minimal showing that Guardian scheduled its employees to work consecutive 8-hour shifts with no overlapping time and yet required its employees to overlap for some period of time at the shift change at least to communicate shift summaries and possibly also to perform patient inspections. According to Defendant's own declarant, the shift summaries were to include "the client's sleeping schedule or bowel movements; whether the client had problems taking medication, how much the client ate, any issues the client was having, anything unusual that happened during my shift, etc." (Doc. No. 30, Exhibit #2, ¶ 8.) This level of detail provides a reasonable basis for crediting the assertion that Ms. Williams was required to work compensable off-the-clock time. And because all DCS employees perform similar job duties and experience shift changes, she and the putative class members are similarly situated. Therefore, the action should proceed collectively.

## VI. <u>CONCLUSION</u>

Plaintiff's Motion is **DENIED** with respect to the allegation of recordkeeping violations and is **GRANTED** with respect to the claim for off-the-clock work.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 12th day of March, 2018.

                                              HON. KEITH P. ELLISON
                                      UNITED STATES DISTRICT JUDGE